Good morning. May it please the Court, I'm Elizabeth Kruschek, an Assistant Federal Defender from Phoenix, and I represent Mr. Castaneda in this matter. I will watch the clock and try to reserve approximately three minutes. Try to pull the microphone maybe a little closer to you, or speak a little louder if you could, because it's not easy to hear you. This Court should reverse the denial of the motion to suppress the evidence found in Mr. Castaneda's backpack. Because the district court erroneously determined that the inevitable discovery doctrine applied, when in fact, the record reflected that discovery of the gun in Mr. Castaneda's backpack was far from inevitable. Inevitable discovery via an inventory search requires the government to prove, first, that the officers obtained legitimate custody of the property, and, second, that the inventory that they conducted was conducted according to standard policies and procedures. And that means both that the policy itself has to cabin officer discretion in the means by which the inventory search is conducted, and the officers have to comply with that policy. In Nix v. Williams, the Supreme Court made clear that inevitable discovery can't involve speculative elements. It is supposed to involve just demonstrated historical facts that are capable of ready verification. And here, the only way you get to inevitable discovery is speculation. There are not demonstrated historical facts that are capable of ready verification. So what are the officers supposed to do? They know he's seen defendant riding the bicycle. They've seen the backpack. They wind up arresting defendant. What are they supposed to do about the bicycle and the backpack? So this goes to the legitimate custody issue. And I think what they're supposed to do is they're supposed to have a policy that guides them in how they deal with this issue. But what are they supposed to do? I mean, just as a practical matter, I mean, I understand your concerns, and I have some concerns with regard to the Department's policy. It seems to me the facts of this case are difficult because you don't expect them just to leave the bicycle with this backpack with something sticking out of it. Was it at a church, I think? Just leave it there. They're taking defendant into custody. There's nobody else that's obvious. It's not like the defendant's got another passenger in a car who presumably could take custody. I really don't understand, practically speaking, what it is the police officer is supposed to do about the bike and the backpack, especially if they have suspicions as to what might be in the backpack. You wouldn't leave something in this case turned out to be dangerous just sitting for anybody else to come along. So as a practical matter, what else could they have done but to take in possession of the bike and the backpack? Well, Your Honor, I can answer that in part by saying what they didn't do and what their policy didn't cabin their discretion in doing, which is that they didn't inquire at all as to Mr. Castaneda's desires or wishes about the property. They did not determine whether there was someone who was available to come and take the property. They didn't determine if it was even his property. They didn't determine if he intended to leave it in the churchyard, because what developed Oh, but if it wasn't his property, what are they supposed to suspect, that he stole the bike and so we should leave it here? I mean, as a practical matter, I'm still waiting to hear. You're telling me what they didn't do. I'm still waiting to hear what they should have done. Well, they could have inquired with Mr. Castaneda as to what his wishes were. And if he was able to provide them with someone who could come and pick up the property or some other way to dispose of the property, they could have done that. The problem with this record is that they made no inquiry. And there's no dispute that they made no inquiry. They didn't determine that the property was his. They didn't determine that he wished to take it with him. It later developed that he attended this church. And so it's possible that he intended to leave it there. The problem is we don't know, because no inquiry was made. And I know there's sort of a response to that, which is, well, the Fourth Amendment doesn't require them to make the inquiry. But I want to be clear that my argument is not that the Fourth Amendment requires them to make the inquiry. What the Fourth Amendment requires is that the policy cabin officer discretion so that they don't get to choose whether or not to make the inquiry based on suspicions that they have, which is what happened here. They believe Mr. Castaneda was suspicious, and they were highly motivated to take this property, to take custody of this property. And the property was across the churchyard. It wasn't within his immediate possession or control. But there's no question they legitimately arrested him. There was an outstanding warrant, right? That is correct, Your Honor. We don't dispute the arrest. And he didn't know the person who was there. They couldn't let it just sit there. Couldn't they cease the property incident to the arrest? No, Your Honor. It's not. It wasn't property that was on his person or within his immediate control at the time. He was riding the bike, and the bike had the backpack. Correct. So what happened, just to be clear, he pulled the bike through a hole in a fence and went on to the churchyard's property, leaned the bike on a shed, the backpack was tied to the bike, and then walked across the property. So according to this didn't come out at the hearing, but according to defense counsel's motion to suppress, there was about a 90-foot range between him and the property. But it's still clear it was his property. Well, he had been. Just because he had, you know, gotten off the bike and walked away. He certainly had been in previous possession of the property, Your Honor. I'm not arguing against you on that point. But my point is, it's possible, and we just don't know on this record, it's possible that he had wanted to leave the property there. It's possible that he could have made alternative arrangements for the property. The police department doesn't automatically have to take custody of the property without making additional inquiry. For example, El Mirage does have a policy in which when they arrest someone who has a vehicle, they are required to give them the option to try to make a way. And if they can't do so, then they can impound them. And that's the sort of discretion that's lacking in this policy. Well, it's interesting because I can see a police department reasonably having a policy that relates to when you're arresting the driver of a car, because that's a common, very common situation. This is kind of a different situation. You have someone on a bike with a backpack going through a hole in a fence at a church. Do you have to have a policy unique to that? I don't know if you have to have that granular of policy, but here's the problem that I have with their lack of policy, is that the officers testified, Officer Chires in particular testified, that when they arrest someone, it is up to the officer's discretion as to whether they contact a third party, friend or family, to pick up their property. And it's the up to the officer's discretion that is the problem with this entire case. Now you agree, Illinois v. Lafayette states, the reasonableness of any particular governmental activity does not necessarily or invariably turn on the existence of a less intrusive means. And here you have a situation where, you know, the police were not required to seek out a friend or a family member because of where this backpack was found. There was nobody who knew Castaneda in the area. I think there is testimony about that. The police asked someone who was near the fence if they knew Castaneda and they said no. So he was talking to a gentleman near where he was standing and there was officer testimony that they spoke to that gentleman who spoke Spanish and he said he didn't know Mr. Castaneda. Just for completeness that later developed that Mr. Castaneda said that that gentleman did work for his stepfather and Mr. Castaneda attended the church. However, to your ultimate question, and I understand that this is a sometimes a difficult line, Illinois versus Lafayette, that's absolutely correct. And I agree that it's not a less intrusive means question. My problem is the discretion. The fact that the officer said it's entirely up to their discretion to determine whether they call someone or not. And they actually said sometimes they do contact people. And one of the problems with the testimony is that the officers never gave Mr. Castaneda the opportunity to volunteer anyone that could be contacted. As I pointed out in my brief, he actually lived approximately four miles away. And so it was possible that someone could have been available to come get his  We don't know. You have the inventory search. Before that, you have the decision to take this property into custody. I'm familiar with authorities with regard to discretion for the inventory search. I'm not so sure that I understand that the police department or the city is required to have policies with regard to that first point. Is there precedent you would point me to that limits the exercise of discretion there? Because it seems to me that the variety of factual circumstances that would be faced by an officer is such that it would be very difficult to develop guidelines that could apply in each case, the time of day, seriousness of the crime, how quickly they need to get back to the station, how long they can wait for somebody else to show up and pick something up, the nature of the object. A car may be one thing, but a bicycle or a backpack or supposed to be, it's very complicated. So I guess what I'm, in a long-winded way, asking, what case supports the proposition that exercising discretion at that stage is a problem? Well, Colorado v. Vertine, the Supreme Court case, has a sentence in it that says there's no indication here that the officers chose to impound the vehicle for investigatory purposes, and therefore, we're going to uphold this inventory search. So the decision to take custody of the property is actually a key point in the analysis. Well, that doesn't tell me that if you don't have guidelines, permitting the officers to exercise their discretion is a problem. In this case, you've got property that's going to be sitting there, available to be picked up by anybody else. I suspect that your client may not have been very happy if his bicycle and backpack were lost because the officers didn't do anything about them. So tell me again what it is about the exercise of discretion at that first step, taking the custody, taking custody of the property is such a problem. Part of it is the way that the testimony came out. What the officers said was it's entirely up to their discretion. And then they also said that they will frequently search the property before they hand it over to family and friends to make sure, and if there's any evidence, they'll bring it in. That is not an appropriate inventory search. It's – I know I sound like a broken record. Well, it's the inventory search, but I'm still – and I understand there's authority there. I don't know of cases that say that the police department can't leave it to the officers to exercise discretion in terms of taking it into custody. They may have done something improper, but it isn't the lack of guidelines that's the problem there. Well, I think the discretion has to ensure that they're vindicating governmental interests. I believe all the Supreme Court case law and all the cases that I cite talk about the importance of the impound, that that decision can't be made – or you – let me rephrase it. You can't be allowed to make that decision for investigatory purposes. You can't have so much discretion that you're allowed to inventory at your will based on your suspicion of criminal activity, which is what happened here. I do see I only have about two and a half minutes left, so I was hoping to reserve some time for rebuttal. Yes, ma'am. Good morning. May it please the Court. My name is Krista Wood, and I'm representing the United States. The firearm in this case was going to be inevitably discovered. The defendant was placed under arrest, and he was going to be booked into custody. As part of that booking procedure, his items would have been inventoried, and as a result of that inventory search, the firearm would have been located. But what if they had said to him, look, we're going to take you in on this warrant. Is there someone that you can call to pick up your bike and your backpack? As the Court noted, that's not a requirement of the Fourth Amendment. I'm saying would it have been inevitably discovered if they had followed that procedure? So if I can understand, if they were required to make that? Well, I'm just saying that typically when there's no analogizing to the car situation, which comes up far more frequently, but they do ask the driver, we're going to take you. Does the passenger have a driver's license? Can the passenger take the car home? There's a policy. And here, this seems like it's rather arbitrary, and I agree with the opposing counsel that we do have a requirement that there be some sort of policy in place at the first step of this kind of thing in the ordinary situation. But I'm saying they said they had no policy. So but would the gun have been inevitably discovered if they had acted akin to their auto policy, which is to say is there someone else who can come get your bike and your backpack? It's unclear. Why is that unclear? Because at the scene, there was one individual that the defendant was speaking with who reported that he did not know who the defendant was. Could Castaneda have called someone? We don't know. But based on the case, the police didn't ask him. Well, Officer Chires testified that he spoke with the defendant about where he was living, and the understanding of Officer Chires from the defendant at the scene was that the defendant was living in Phoenix, which is a greater distance from El Mirage. I think counsel just said 4 miles. She reported that, and that was in the reply brief, but that was not part of the suppression hearing. At the time of the suppression hearing, it was the understanding of the officers and I'm sorry, at the time of the contact with Mr. Castaneda. But they actually didn't know because they didn't ask, right? Based on the testimony, they did ask. Mr. Chires, I'm sorry, Officer Chires spoke with the defendant and asked and was under the impression that the defendant lived in Phoenix, which is substantially more than 4 miles away from El Mirage. So based on the evidence that we have, there was nobody readily available to take the firearm, I'm sorry, take the bicycle and the backpack. What we do know and what the district court found was that they saw the defendant riding the bicycle, he had the backpack, it was in a high crime area, it was close to another home that was known for theft and criminal activity. They would be liable if they left the backpack there and it was stolen or liable if anybody in the community was harmed. And so there was no situation in which the officers would not take the bicycle and the backpack to be inventoried because the defendant was placed under arrest. So you're saying that was the policy? Yes, Your Honor. The policy was to ---- Did the police say that? I'm sorry? Did the police say that? The police, all three officers testified that it was policy to when the person was placed under arrest to take their possessions and to be inventoried. Thank you. What do you make of the testimony that the officers said that they hoped that there would be incriminatory evidence obtained during the inventory process? Just as a clarification, yes, I believe I know the testimony you're referring to, Officer Lazinski testified that he was anxious to conduct an inventory search and he believed there might be items of evidentiary value in the backpack. He also testified that an inventory would be conducted regardless, and he was the only officer who testified about possible investigatory motives. As in Bowhay, whether an officer has dual bona fide motives doesn't invalidate the search, and all officers testified that there was an intent to conduct an inventory. But, yes, I do know the portion that you're discussing with Officer Lazinski. Thank you. Would you address the supervised release condition? Yes, Your Honor. The supervised release condition is that the defendant have medication, any and all medication that is ordered. This should be interpreted in light of prior case law, which is to be read that it does not implicate a significant liberty interest, and with that additional reading on there, it does not make the condition invalid. It is reasonably. Can we narrow it? I mean, I don't think we can. I think we have to ask the district court to clarify that and put it in writing. As in United States v. Cope, as well as United States v. Asparza, which were both cited in the briefs, those cases were both remanded on separate issues, and they specifically said if the condition is to be construed to implicate a significant liberty interest, then there needed to be an additional Williams finding. If those findings were not made, then that condition would be read just to implicate those medications that would not impinge upon a significant liberty interest. Why is this situation that we have here any different from Cope and Daniels and Williams? I don't believe it is any different, Your Honor. So in those situations, this Court vacated the sentence and remanded it to the district court with instructions to clarify any medication condition imposed or to make relevant medically informed findings. Why shouldn't that be done here? In those particular cases, there were other instances or other reasons that those cases were remanded. So for instance, in U.S. v. Daniels, the Court said, If no such record is developed, the condition will be construed to be limited to medications that do not implicate the defendant's significant liberty interest. And that's on page 926. Also in United States v. Asparza, we remand this condition to the district court so that it can make necessary findings with respect to the requirement that take the prescribed medication. But if the Court chooses to require the defendant to take medications implicating that particular significant liberty interest, and I feel as though I stumbled over that. So the point being that in Asparza, if the Court wanted to impose a condition to implicate the significant liberty interest, an additional finding needed to be made. And we've said something like that in unpublished cases since, but it leaves me a little perplexed, because how are we supposed to figure out, how is anybody supposed to figure out with a concept as vague as medication that affects or implicates a significant liberty interest, what kind of guideline is that? I mean, is there a list that's, okay, these drugs implicate a liberty interest and these drugs don't, or what's to be done in practice? In practice, the courts, the Court has imposed, has found that medications implicate a significant liberty interest in three situations, chemical, castration, penile, plasmagraphy, and antipsychotic medication. Roberts. That's the carve-out. Yes. Ginsburg. So the other problem I have with this is that it's ambiguous. It seems as though it's the probation officer can order the medication, doesn't have to go back to the judge, and there doesn't have to be any findings that the medication is appropriate? It would be any and all medications prescribed by medical or other treatment personnel during the term of supervised release. So it's not a condition that the probation officer would make that determination. It would be a medical personnel. So if something was prescribed that defendant thought crossed the line, what's the defendant supposed to do? The defendant could work with his attorney, and if he felt that there was something that was invalid that was being prescribed, work with the probation officer or his attorney to be redressed by the district court if that situation arose. Now, here the medications are, correct me if I'm wrong, psychoactive medications. In this particular case? Yes. Are they?  What kind of medications are they? As pursuant to the pre-sentence report, Ryder, the defendant suffered from mental health, like depression and things like that and was taking Xanax. So that's the only specific medication that's on the record that's been addressed. Okay. And whether he's ‑‑ I don't know his current medication list. But he may be forced to choose between taking psychoactive medications. Antipsychotics have been shown to ‑‑ have been found to impinge upon a substantial liberty interest. So, no, he would not be forced to take antipsychotic medications. What is the meaning of antipsychotic? I wish I was more intelligent about antipsychotic. But it's my understanding it's a particular group of medications, and those have been determined to be impinging upon a substantial liberty interest. And that would be known by the medical professional who would be responsible for prescribing those medications. If there are no further questions, I would submit and ask the court to affirm the district  Thank you. Thank you, counsel. I did want to briefly address the issue of dual bona fide motives, and then I'll try to address the supervised release condition if that is okay. As to dual bona fide motives, I want to be clear. BOHE does say that officers with dual bona fide motives who have no discretion can conduct lawful inventory searches. But I want to reemphasize that my point is that there was so much discretion allowed here that the officers were allowed to use their inventory policy as a ruse to try to collect evidence. And so, therefore, the fact that there may have been another motive doesn't matter because they both weren't dual bona fide motives given the amount of discretion. As to the supervised release condition, I agree with the concerns expressed by the court. Judge Clifton alluded to the risk of violation. And just to be clear, I believe opposing counsel misstated the medication is Zoloft that Mr. Castaneda had been previously prescribed for anxiety and depression. But those kinds of medications, while they may not technically be considered psychotropic medications, which I think are usually used for schizophrenia or things like that, they still have impacts on the brain and body that are significant, and they impact brain chemistry. And so I believe that if this condition were to stand, Mr. Castaneda would be forced to make a decision between, you know, taking medication that can impact his brain and body, some of those medications carry risks that are as significant as suicide, and facing potential violation proceedings and incarceration. And so I think Go back to court at that point? He shouldn't have to do that. He shouldn't have to make that kind of decision. He should have notice going into it what is considered a violation and what is not, particularly given this issue of mental health, that this is such a difficult issue and the medications have such broad and varying side effects. If you were the district court judge here at sentencing, how would you have framed or phrased the condition of supervised release with respect to medication? I wouldn't have imposed it, Your Honor, simply because I don't think he should be required to take this kind of medication. I think that's an issue between him and his doctor. It's one thing to go to mental health counseling and try to get this assistance, but I don't think the medication requirement is actually necessary. If it were, I think one has to make specific findings as to the nature of the illness or condition that is to be treated, the medications that have been used and what potential side effects they are, and how that could be resolved by the court. So I think it would have to be a much more detailed proceeding if that medication condition were to be imposed. Thank you, counsel. Thank you, Your Honor. U.S. v. Castaneda. We'll take up Rose E. Baker.
judges: Wardlaw, Clifton, Katzmann